———————————————————————————— |

OLD REPUBLIC NATIONAL TITLE
INSURANCE COMPANY, a Minnesota corporation, | Case No. 1:08-cv-796

    Plaintiff, |

        v. | HONORABLE PAUL L. MALONEY

ESCROW AND TITLE SERVICES, INC.,
d/b/a Bell Title Company, |

    Defendant. |

———————————————————————————— |

## OPINION and ORDER

**Granting the Defendant's Motion to Dismiss Count 3 (Michigan Negligence Claim) under *Fultz*;
Denying the Defendant's Motion for Summary Judgment on Counts 1 and 2 (Contract Claims)**

Under Michigan common law, plaintiff Old Republic National Title Insurance Company

("ORT") asserts two breach-of-contract claims and one negligence claim against defendant Escrow

& Title Services, Inc., which does business as Bell Title Company ("Bell"). In September 1994, the

parties entered into a contract which appointed Bell as ORT's agent to issue title insurance policies

in connection with real estate transaction closings ("the agreement"). *See* Am Comp ¶ 13 & Ex A.

As title-insurance agent, Bell kept 80% of the title insurance premium paid for each ORT title it

issued in Michigan, remitting the remaining 20% to ORT. *See* Am Comp ¶ 14 & MTD Ex A § 6.

In return, section 3 of the agreement obligated defendant Bell to "receive and process

applications for title insurance and issue policies in a timely, prudent, and ethical manner with due

regard to recognized title insurance underwriting practices and in accordance with the rules and

instructions of the insurer, as well as in conformity with state and local laws and practice." MTD Ex A § 3. Section 8 of the agreement, entitled Preparation of Policies and Commitments, obligated Bell to expressly identify as exceptions to coverage all matters such as taxes, encumbrances, liens, restrictions, easements, and any other items which constituted a defect in title or raised a question as to the validity or marketability of the title being insured. *See* Am Comp ¶ 15 & MTD Ex A § 8.

Section seven obligated Bell to indemnify ORT for certain losses arising from Bell's issuance of title commitments and policies underwritten by ORT, including payments to insured parties and third-party claimants. The agreement defines these indemnifiable losses to include

(1)     Bell's intentional or negligent failure to comply with the terms of the agreement or ORT's rules, regulations or instructions;

(2)     Bell's intentional omission (from commitments or policies) of references to encumbrances or title defects which were disclosed by the insured's application, by Bell's search and examination of title, by an approved examiner's report, by certification of title, of which were otherwise known to Bell when it issued the title insurance policy;

(3)     Bell's improper closing or improper attempted closing, including but not limited to the failure to disburse properly or to close in accordance with escrow or closing instructions; and

(4)     negligent errors or omissions in the title search, title examination, title insurance form preparation, or other procedures involving a title insurance application.

Am Comp ¶ 16 & Ex A § 7.

ORT originally asserted five claims against Bell, but a June 2009 joint stipulation settled and dismissed ORT's claims regarding the February 2003 Thompson closing (Orig Comp ¶¶ 10-19); and the November 2004 Jones closing (*id.* ¶¶ 27-37). The parties subsequently settled a third

claim[1] before ORT filed its amended complaint, which keeps ORT's claims as to only two transactions.

**Edwards Transaction.**  First, Argent Mortgage Company, LLC ("Argent") issued a first-mortgage loan of $136,800 to Patricia Edwards and Terry Towers ("the Edwards transaction"), secured by property in Holt, Michigan, and Bell issued a title insurance commitment to Argent to insure its first-mortgage lien, *see* Am Comp ¶¶ 17-18.  **The Argent mortgage closing took place on November 11, 2004, yet Bell allegedly failed to deliver the mortgage to the Ingham County Register of Deeds for recordation until January 31, 2005, more than two and a half months later**, *see* Am Comp ¶ 19.

Meanwhile, on December 6, 2004, mortgagor Edwards filed a petition for Chapter 7 bankruptcy protection, Am Comp ¶ 20.  Because the mortgage lien had not been recorded within the ten-day period set forth in 11 U.S.C. § 547(e)(2)(C)(ii), the bankruptcy trustee initiated an adversary proceeding against Argent to avoid the mortgage as a "preferential transfer", *id.* ¶ 21.[2]  To preserve

---

[1]

The amended complaint no longer seeks recovery relating to the Michael Fanke closing. *See* Orig Comp ¶¶ 47-53 (although Fanke was married, Bell allegedly failed to obtain the signature of Fanke's wife on the mortgage documents at closing, thereby failing to address her dower interest; Fanke ultimately defaulted on the mortgage, but the absence of his wife's signature on the mortgage at closing prevented mortgagee Chase from proceeding with judicial foreclosure proceedings; ORT filed suit on behalf of mortgagor Chase to reform the mortgage and establish an equitable lien against the subject real property, incurring about $5,200 in attorneys' fees and costs); *see also* Orig Comp ¶¶ 55e, 59e, and 63-66.

[2]

In the federal bankruptcy code, a preferential transfer is defined as "any transfer of an interest of the debtor in property –

(1)     to or for the benefit of a creditor;

(2)     for or on account of an antecedent debt owed by the debtor before such transfer was made;

Argent's mortgage lien, ORT paid $19,000 to the bankruptcy trustee to settle the adversary proceeding and fully perfect Argent's interest in the property.  ORT also incurred about $2,500 in attorneys' fees and costs, *id.* ¶¶ 22-23.

**The Jackson Closing.**  On February 28, 2003, Resource Mortgage issued a first-mortgage loan of $97,800 to Andrew and Rose Jackson, secured by property in Lansing, Michigan, and Bell issued a title insurance commitment to Resource to insure its first-mortgage lien interest in the property.  *See* Am Comp ¶¶ 24-25; *see also* P's Opp, Ex B (Jackson mortgage lien) and Ex C (Loan Commitment of Title Insurance for Jackson mortgage).  It is undisputed that some of the Jackson mortgage proceeds were supposed to be used to pay off and discharge a "future advance mortgage", which a seller named Joe Vermetti ("Vermetti") had taken to secure a $70,000 revolving home-equity line of credit ("LOC")to LaSalle Bank Midwest N.A. (f/k/a Standard Federal and n/k/a Bank

---

    (3)      made while the debtor was insolvent;

    (4)      made –
          (A)     on or within ninety days before the date of the filing of the petition; or
          (B)     between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    (5)      that enables such creditor to receive more than such creditor would receive if –
          (A)     the case were a case under chapter 7 of this title;
          (B)     the transfer had not been made; and
          (C)     such creditor received payment of such debt to the extent provided by the provisions of this title."

11 U.S.C. § 547(b).  "'Property of the debtor' subject to the preferential transfer provision is best understood as that property [which] would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."  *Central Va. Cmty. Coll v. Katz*, 546 U.S. 356, 373 n.10 (2006) (quoting *Begier v. IRS*, 496 U.S. 53, 58 (1990)).  *See, e.g., In re Wells*, 561 F.3d 633 (6th Cir. 2009) (<u>Ryan</u>, Siler, Griffin), *reh'g & reh'g en banc denied* (6th Cir. July 14, 2009).

of America), *see* Am Comp ¶ 26 and P's Opp Ex D (Jackson Escrow/Closing Instructions) and Ex E (Vermetti mortgage taken out on Oct. 25, 2002 and recorded with Ingham County Register of Deeds on Dec. 5, 2002 at Liber 2995, Page 1086).

Plaintiff ORT emphasizes the following language from the Vermetti mortgage regarding discharge of that mortgage and termination of the underlying LOC:

> Grantor acknowledges and agrees that this Mortgage shall not be extinguished, and the priority of this Mortgage shall not be altered in any way, if the Indebtedness secured hereby is reduced to a balance of zero at any time or from time to time. This mortgage shall be terminated only after all amounts due to Lender under this Mortgage and the Credit Agreement [LOC] have been paid in full, the Credit Agreement has been terminated by Grantor or cancelled by Lender, and a discharge of this Mortgage has been duly recorded by Lender.

P's Opp Ex E at 1. Plaintiff ORT alleges, without citation to the record, that "[t]he Vermetti mortgage was known to Bell Title at the time of [the Jackson] closing." P's Opp at 4.

The Jackson closing statement – known as a "HUD-1 statement" – shows that defendant Bell did issue a check for $70,360.52 to payoff Vermetti's LOC, as the parties intended, *see* P's Opp Ex F, but ORT alleges that Bell never effected the closure of the LOC and that the Vermetti mortgage "was not discharged in the chain of title", P's Opp at 5 (*see also* Am Comp ¶ 27).

The Jackson mortgage was later assigned to JP Morgan Chase Bank ("JP Morgan"), and this assignment too was recorded with the Ingham County Register of Deeds on April 29, 2004 at Liber 3105, Page 367, *see* Am Comp ¶ 29.

 Seller Vermetti – debtor on the paidoff but not-discharged mortgage and the never-closed LOC – subsequently withdrew additional funds from the HELOC which he failed to repay, *see* Am Comp ¶ 29. In October 2005, LaSalle sued assignee JPMorgan in Michigan state court to foreclose on the first-lien Vermetti mortgage ("the Oakland County action"), *id.* ¶ 30, and JPMorgan

submitted a title claim, of which plaintiff ORT received notice. ORT assigned the claim to its Vice-

President and Michigan State Counsel, Philip T. Savich, Esq., for investigation and resolution. ORT

in-house counsel Savich affies that his

> standard practice and procedure with respect to reviewing, investigating, and
> resolving claims on behalf of ORT included, but was not limited to: (a) examining
> the claim letter and any supporting documentation provided by the insured; (b)
> contacting the title agent to request a copy of their complete closing file; (c) and
> from his review of the title claim, supporting documents and the agent closing file,
> as supplemented by his communications with the insured, the agent and/or third
> parties, whether the claim was covered under the Loan Commitment of Title
> Insurance and/or Loan policy of Title Insurance issued by the title agent at the time
> of closing. [Savitch Aff] ¶ 6.

> For analysis of claims that involved non-discharge of a previously recorded future
> advance mortgage secured by a revolving line of credit claimed to have priority over
> ORT's insured mortgage, as was the case with the Jackson mortgage/JP Morgan
> claim, Savitch's standard practice and procedure was to also request documentation
> from the title agent evidencing: (a) payoff of the revolving line of the credit at the
> time of closing of the insured mortgage, including copies of a signed, written request
> by the mortgagor requesting same ("closeout letter"); (c) proof of transmittal of the
> payoff check and closeout letter to the future advance mortgage holder [Standard
> Federal n/k/a LaSalle]; and (d) discharge of the future advance mortgage, including
> copies of any documentation acknowledging same. [Savitch Aff] ¶ 7.

> Savitch's review and investigation of the JP Morgan claim revealed the following:
> (a) the Loan Commitment of Title Insurance and/or Loan Policy of Title Insurance
> issued to Resource Mortgage by Bell Title insured a valid first[-]lien position against
> the subject property to Resource Mortgage, its successors and assignees, with respect
> to the Jackson mortgage; (b) the mortgage proceeds advanced by Resource mortgage
> at the time of closing were to be used, in part, to pay off, close and discharge the
> Vermetti mortgage securing Vermetti's revolving line of credit with Standard
> Federal; and (c) Bell Title issued a check to Standard Federal in the amount of
> $70,360.52 at the time of the Jackson mortgage closing to payoff the revolving line
> of credit. [Savitch Aff] ¶ 8.

> **Bell Title could not produce written documentation evidencing the existence and
> transmittal of a closeout letter and/or written acknowledgement by Standard
> Federal confirming closure of the line of credit and/or discharge of the Vermetti
> mortgage.**

*Id.* (final ¶ break added). To preserve assignee JP Morgan's mortgage interest in the property,

plaintiff ORT paid LaSalle about $81,600 to pay-off and discharge Vermetti's HELOC. ORT also incurred about $1,300 in attorneys' fees and costs, *see* Am Comp ¶¶ 31-32 and P's Opp Ex G (Savitch Aff) ¶ 10. ORT in-house counsel Savitch thought that ORT was obligated to do so, in light of his "prior experience handling title claims involving the non-discharge of a previously recorded future advance mortgage secured by a revolving [LOC]", because Bell Title was unable to produce any documents establishing that Bell Title had written a closeout letter and sent it to the holder of the Vermetti mortgage and/or that the holder acknowledged receiving such a closeout letter, *see* P's Opp Ex G (Savitch Aff) ¶ 9.

ORT's Claims Against Bell Title.

**With regard to the Edwards closing**, ORT claims that Bell's alleged failure to timely record the Argent mortgage lien[3] constituted breach of contract (Count 1, Am Comp ¶ 34a), breach of the insured lender's closing instructions (Count 2, Am Comp ¶ 38a), and common-law negligence or gross negligence (Count 3, Am Comp¶¶ 42-44).

**With regard to the Jackson closing**, ORT claims that Bell's failure to discharge and close the LaSalle Bank HELOC constituted breach of contract (Count 1, Am Comp ¶ 34b), breach of the insured lender's closing instructions (Count 2, Am Comp ¶ 38a), and common-law negligence or gross negligence (Count 3, Am Comp ¶¶ 42-44). Plaintiff ORT seeks $104,382.50 in compensatory damages on each of the first three counts, and count four seeks that same amount by way of common-law and/or contractual indemnification, plus interest and attorneys' fees and costs, Am

---

[3]

*See generally Rogow v. Comerica Bank*, 2007 WL 624669, *2 (Mich. App. Mar. 1, 2007) (p.c.) (P.J. O'Connell, Saad, Talbot) (discussing the "race-notice" statute, MICH. COMP. LAWS § 565.29, and the potential consequences of failing to properly and timely record a mortgage lien), *app. denied*, 737 N.W.2d 718 (Mich. 2007).

Comp ¶¶ 48-51.

<u>Original Complaint Was Dismissed Without Prejudice for Failure to Establish Jurisdiction</u>

This court determined that the original complaint did not allege sufficient facts to allow the court to ascertain whether or not diversity jurisdiction existed. Accordingly, the court dismissed the original complaint without prejudice and ordered ORT to file an amended complaint by December 2, 2009 which cured the jurisdictional pleading defect. *See Old Republic Title Ins. Co. v. Escrow & Title Servs., Inc.*, No. 1:08-cv-796 Doc 25, 2009 WL _____ (W.D. Mich. Nov. 4, 2009) (Maloney, C.J.). The order also directed ORT to omit material which was relevant only to settled claims; calculate indemnification without reference to settled claims; and specify the source of authority for the putative indemnification obligation. *Id.* ORT filed an amended complaint in December 2009, *see* Doc 27, and it contains sufficient factual allegations to support a finding of diversity jurisdiction (applying the U.S. Supreme Court's new "nerve center" test for determining a corporation's principal place of business, *see Hertz Corp. v. Friend* (Feb. 2010)).

In January 2010 Bell timely filed a motion to dismiss the amended complaint for failure to state a claim, or in the alternative for summary judgment (Doc 37), plaintiff ORT filed an opposition brief (Doc 42) in February 2010, and Bell filed a reply brief (Doc 43) in March 2010. This court heard oral argument on Monday, June 7, 2010. For the reasons that follow, the court will grant Bell Title's Rule 12(b)(6) motion to dismiss the negligence claim (count 3) as duplicative of the contract claims (counts 1 and 2), but will deny its motion for summary judgment on the contract claims (counts 1 and 2).

**LEGAL STANDARD: DISMISSAL FOR FAILURE TO STATE A CLAIM**

This court assesses a Rule 12(b)(6) motion to dismiss for failure to state a claim on which

relief can be granted under the same standard as a Rule 12(c) motion for judgment on the pleadings. *Griffin v. Reznick*, 2008 WL 4741738, *2 (W.D. Mich. Oct. 28, 2008) (Maloney, C.J.) (citing, *inter alia*, *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007)).

Such motions turn on legal issues, not an assessment of the evidence. *Griffin*, 2008 WL 4741738 at *2 (citing *Technology Recycling Corp. v. City of Taylor*, 186 F. App'x 624, 640 n.5 (6th Cir. 2006) (Griffin, J.) ("*Tech Rec*") and *Thomas v. Arn*, 474 U.S. 140, 150 n.8 (1985) ("[M]otions for judgment on the pleadings and dismissal for failure to state a claim on which relief can be granted . . . consist exclusively of issues of law.")).  A Rule 12(c) motion is simply one permissible avenue for contending that the complaint should be dismissed because it fails to state a claim on which relief can be granted. *See Griffin*, 2008 WL 4741738 at *2 (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 507 (2006) ("a defense of failure to state a claim upon which can be granted . . . may be made in any pleading . . . or by motion for judgment on the pleadings, or at the trial . . . .") (quoting Fed. R. Civ. P. 12(h)(6))).

"Such motions 'presume as a legal matter the lack of any need for an evidentiary hearing . . .'" *Griffin*, 2008 WL 4741738 at *3 (citing *US v. Raddatz*, 447 U.S. 667, 693-94 (1980)).  The court must accept all of the complaint's factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *Tech Rec*, 186 F. App'x at 640 n.5 (citing *PONI, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005)); *see also Bohanan v. Bridgestone/Firestone No. Am. Tire, LLC*, 260 F. App'x 905, 906 (6th Cir. 2008) (citing *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001)); *Heggie v. Kuzma*, 2009 WL 594908, *9 (W.D. Mich. Mar. 6, 2009) (Maloney, C.J.) ("the court must accept as true all Plaintiff's allegations and construe the complaint liberally in his favor") (citing *Herron v. Harrison*, 203 F.3d 410, 414 (6th Cir. 2000)).  But

the court need not draw unwarranted factual inferences or accept the plaintiff's *legal* conclusions. *Bohanan*, 260 F. App'x at 906 (citing *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999)).

And each claim's factual allegations must *plausibly* suggest a viable claim; the claim must be plausible and not merely conceivable. *Griffin*, 2008 WL 4741738 at *3 (citing *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 455 (6th Cir. 2007) (en banc) (Sutton, J., joined by Griffin et al.) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, –, 127 S.Ct. 1955, 1974 (2007))). "The 'factual allegations must be enough to raise a right to relief above the speculative level'", not merely create a "'*suspicion* of a legally cognizable cause of action . . . .'" *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quoting *Twombley*, 550 U.S. at –, 127 S.Ct. at 1974) (internal alterations omitted)). There must be either direct of inferential allegations regarding all the material elements of each claim. *LULAC v. Bredesen*, 500 F.2d 523, 527 (6th Cir. 2007) (McKeague, J.) (citing *Twombley*, 550 U.S. at –, 127 S.Ct. at 1969).

Our Circuit cautions that district courts should not overstate the hurdle that *Twombley* establishes for plaintiffs to survive a Rule 12(b)(6) or Rule 12(c) motion:

> In *Erickson v. Pardus*, 550 U.S. [89], 127 S.Ct. 2197 . . . (2007) [(p.c.)], decided two weeks after *Twombley*, however, the Supreme Court affirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 2200 (quoting *Twombley*, 127 S.Ct. at 1964). The opinion in *Erickson* reiterated that "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Id.* (citing *Twombley*, 127 S.Ct. at 1965). We read the *Twombley* and *Erickson* decisions in conjunction with one another when reviewing a district court's decision to grant a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12.

*Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 550 (6th Cir. 2008) (Griffin, J.) (quoting *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295-96 (6th Cir. 2008) (footnote omitted))

(other internal quotation marks and alterations omitted).  Nonetheless, "[w]hile a complaint need not contain detailed allegations, [it] must include more than mere labels and conclusions." *Petros v. Sampson*, 2009 WL 2761425, *2 (W.D. Mich. Feb. 4, 2009) (Edgar, J.) (citing, *inter alia*, *Twombley*, 550 U.S. at –, 127 S.Ct. at 1965).

Ultimately, ""a claim has facial plausibility when the party seeking relief 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *US v. Washington State DOT*, – F. Supp.2d –, –, 2009 WL 2985474, *3 (W.D. Wash. Sept. 15, 2009) (quoting *Ashcroft v. Iqbal*, – U.S. –, –, 129 S.Ct. 1937, 1949 (2009) (J. Kennedy for the Court, joined by C.J. Roberts, and JJ. Scalia, Thomas, and Alito)).

When considering whether to grant a Rule 12(c) or 12(b)(6) motion, the court primarily considers the complaint's allegations, but may also take into account items appearing in the record and attached exhibits.  *Poly-Flex Const., Inc. v. NTH, Ltd.*, 582 F. Supp. 892, 901 (W.D. Mich. 2008) (Maloney, C.J.) (citing, *inter alia*, *Amini v. Oberlin College*, 259 F.3d 493, 502 (6ᵗʰ Cir. 2001)).  The court may also consider, without converting the 12(b)(6) motion into a motion for summary judgment, "matters of public record (e.g. pleadings, orders and other papers on file in another action pending in the court; records or reports of administrative bodies; or the legislative history of laws, rules or ordinances) as long as the facts noticed are not subject to reasonable dispute." *Pakootas v. Teck Cominco Metals, Ltd.*, 632 F. Supp.2d 1029, 1032 (E.D. Wash. 2009) (citing *Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9ᵗʰ Cir. 2007)); *accord River Village West, LLC v. Peoples Gas Light & Coke Co.*, 618 F. Supp.2d 847, 850 (N.D. Ill. 2008) (on Rule 12(c) or 12(b)(6) motion, "the court may take judicial notice on matters of public record") (citing *US v. Wood*, 925 F.2d 1580, 1581-82 (7ᵗʰ Cir. 1981)).

## DISCUSSION:  MOTION TO DISMISS COUNT 3, NEGLIGENCE

Seeking to dismiss Count 3 (Negligence) for failure to state a claim on which relief may be granted, defendant Bell argues as follows:

> In . . . Count III, ORT [contends] that Bell Title owed it a duty to "receive and process applications for title insurance and issue such commitments and/or policies with due regard to recognized title insurance underwriting practices and in accordance with the rules and instructions of Old Republic Title and its insured lenders."  And, the allegation continues, to the extent [that] Bell Title retained contractors to perform the searches and examinations, it had a duty to ensure "that such individuals also performed such duties in accordance with recognized title insurance underwriting practices, as well as the rules and instructions of Old Republic Title and its insured lenders." (*See*, amended complaint.)  [sic] Plaintiff mistakenly portrays this duty as separate and distinct from Bell Title's duties under the Agency Agreement.

> In *QQC, Inc. v. Hewlett-Packard Co.*, the court held that "Plaintiffs cannot establish a violation of legal duty that is separate and distinct from Defendant's contractual duties; thus, under Michigan law, [the fraud counts] . . . fail to state a claim upon which relief can be granted."  258 F[.] Supp[.]2d 718, 724 (E[.]D[.] Mich[.] 2003).

> In *QCC, Inc.*, the defendant contended that the three fraud claims should be dismissed because the plaintiffs did not establish a breach of a legal duty that is separate and distinct from the defendant's contractual duties under the development agreement.  *QQC, Inc.*, 258 F[.] Supp[.]2d at 722.  The court agreed with the defendant and stated that the law in Michigan is well-settled that an action in tort requires a breach of duty that is "separate and distinct from a breach of contract." *Id.* at 721.  The court reasoned that the operative allegations in the plaintiffs' fraud claims would not exist in the absence of the contracts at stake, thus these claims cannot be maintained as tort-based under Michigan law.  *Id.* at 722.

> Similarly . . . Defendant's alleged duty does not exist absent the Agency Agreement. Bell Title's duty to receive and process applications for title insurance and issue such commitments with due regard to recognized title insurance underwriting practices would not exist outside the boundaries of the Agency Agreement.  Therefore, like in *QQC, Inc.*, the tort-based claim should be dismissed.  Hence, Plaintiff's Count III Negligence/Gross Negligence should be dismissed because the operative allegations are not separate from the allegations for breach of contract.

Def Bell's MTD at 20-22.  **Citing no Michigan case law – or *any* case law – plaintiff ORT's opposition brief addresses this issue as follows, in its entirety:**

Finally, ORT's breach of contract and negligence claims are separate and distinct claims. For instance, Bell Title's failure to follow the closing instructions in the Edwards closing violated the contractual relationship [sic, should be "contract"] between the two parties. Likewise, Bell Title was contractually obligated to ensure that the Vermetti future advance mortgage [HELOC] was discharged in the Jackson closing. However, the method of doing that and the requirement that a closing letter be sent to the bank signed by the seller, implicates industry standards.

The trier of fact may conclude that contractual obligations and the duty of care differ in some respects, and that Bell Title failed to meet one but not the other (or that they failed to meet both) in either of the closings at issue. Of course, ORT's damages are the same under either theory. However, just because the parties have a contractual relationship does not mean it is impossible for Bell Title to commit acts of negligence outside of the contract. Accordingly, ORT's negligence claims should survive.

P's Opp at 16. Defendant Bell's reply brief merely "restates its arguments in the Motion concerning the dismissal of the ORT negligence claim." Def Bell's Reply at 10. The court notes with disapproval that counsel have provided absolutely *no* Michigan state-court judicial decisions, whether binding or persuasive, to help this court to predict how the Michigan Supreme Court would rule on Bell's negligence/tort argument.

**Bell Title contends that the negligence claim must be dismissed because ORT has not alleged any tort duties that are sufficiently distinct from the contractual duties that ORT owed Bell Title. Because of the less-than-bright line between tort and contract claims in some situations, an extensive review of the Michigan case law over the years is helpful to an informed ruling on this argument.**

Until recently, the seminal decision on these issues in the modern era was *Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956).[4] Hart and other orchard owners sued Ludwig for "refusing and

---

[4] Although *Hart* has been overtaken in important respects by subsequent decisions regarding Michigan's tort/contract distinct-duty doctrine, it continues to be cited for a specific application of the doctrine: the rule that a claim for bad-faith handling of an insurance claim is not cognizable at

neglecting" to abide by an oral agreement to care for their trees. Specifically, he worked the orchard during the spring of 1952, but sometime during the 1953 season he stopped removing shutes, pruning, fertilizing, and protecting the trees against animals. *Hart*, 79 N.W.2d at 896. The orchard owners sued Ludwig for negligence, and the Michigan Supreme Court squarely confronted the question, "we have, clearly, an action in tort, arising out of breach of contract. Can it be maintained?" *Id.*

Reviewing the British and early American common law, the 1956 Michigan Supreme Court noted that courts had gradually drawn this distinction: when someone undertakes to perform work under an agreement, he can be held liable in tort for "misfeasance", i.e., if he performs poorly, carelessly, or incompletely, but no tort action will lie for "nonfeasance,", i.e., if he simply does nothing to render the promised performance. *Hart*, 79 N.W.2d at 896-97. Acknowledging that the line between contract and tort actions was sometimes unclear, the Supreme Court enunciated the following principle:

> When the cause of action arises merely from a breach of promise, the action is in contract. The action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of a promise. Otherwise, the failure to meet a [promissory] note or any other promise to pay money, would sustain a suit in tort for negligence, and thus the promisor be made liable for all the consequential damages arising from such failure. *As a general rule, there must be some active negligence or misfeasance to support tort. There must be some breach of duty distinct from breach of contract.*

*Hart*, 79 N.W.2d at 897. Applying this rule to the facts at hand, the Court held that the orchard

---

Michigan common law because it does not involve a duty sufficiently distinct from a claim for breach of the insurance contract. *See Cromer v. Safeco Ins. Co. of America*, 2010 WL 1494469, *3 (E.D. Mich. Apr. 14, 2010) (noting that *Hart* has been quoted and cited for this proposition by *Casey v. Auto Owners Ins. Co.*, 273 Mich. App. 388, 729 N.W.2d 277, 286 (Mich. App. 2006) and *Kewin v. Mass. Mut. Life Ins. Co.*, 409 Mich. 401, 295 N.W.2d 50 (Mich. 1980)).

owners could *not* bring a tort claim against Ludwig for discontinuing his promised efforts. Quoting the first edition of Prosser's Handbook on the Law of Torts, the Court declared that

> "if a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not."

> Before us, however, we have not such a case. We have simply the violation of a promise to perform the agreement. The only duty, other than that voluntarily assumed in the contract . . . , was his duty to perform the promise in a careful and skillful manner without risk of harm to others, the violation of which is not alleged. What we are left with is defendant's failure to complete his contracted-for performance. This is not a duty imposed by the law upon all, the violation of which gives rise to a tort action, but a duty arising out of the intentions of the parties themselves and owed only to those specific individuals to whom the promise runs. A tort action will not lie.

*Id.* at 898-99.

About thirty years later, the Michigan Supreme Court reaffirmed *Hart* in a different context. In *Owens v. Auto-Owners Ins. Co.*, 374 N.W.2d 905 (Mich. 1985), a girl was injured in an automobile accident, and her parents sued their no-fault insurer. *Owens*, 374 N.W.2d at 906. The insurer paid her ambulance and hospital expenses, but refused to pay replacement benefits, which the parents contended was not only a breach of the insurance contract but also a tort – the intentional infliction of emotional distress. *Id.* at 906.

The insurer tried to rely on *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50 (Mich. 1980), where the Court held that (1) a disability insurance policy did not involve matters of mental concern and solicitude that would justify an award of mental-distress damages for its breach, *see Owens*, 374 N.W.2d at 907 (quoting *Kewin*, 295 N.W.2d 50) (footnote 5 omitted), and (2) exemplary damages were not recoverable for breach of a commercial contract "'absent allegation and proof of tortious conduct existing independent of the breach [of the contract].'" *Owens*, 374 N.W.2d at 907-08 (quoting *Kewin*, 295 N.W.2d at 50, and citing *Valentine v. Gen. Am. Credit, Inc.*, 362 N.W.2d 628,

633 (Mich. 1984) (employee could not recover mental-distress damages for breach of employment contract, and he could not recover exemplary damages unless he pled purposeful tortious conduct)).

The *Owens* Court noted that *Kewin* had left open the question whether a separate tort claim for intentional infliction of emotional distress may be brought on the basis of an insurer's dilatory handling of a claim. *Owens*, 374 N.W.2d at 908 (footnote 6 omitted). In considering that question, the Supreme Court harkened back to *Hart v. Ludwig* (Mich. 1956):

> The action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of a promise * * *
>
> As a general rule, there must be some active negligence or malfeasance to support tort. *There must be some breach of duty distinct from breach of contract.* * * *

*Owens*, 374 N.W.2d at 909 (quoting *Hart*, 79 N.W.2d at 895 (quoting *Tuttle Gilbert Mfg. Co.*, 13 N.E.465 (Mass. 1887)) (emphasis added).

**The Michigan Supreme Court revisited the contract/tort issue six years later in *Ferrett v. GMC*, 475 N.W.2d 243 (Mich. 1991)**, where General Motors fired an employee for excessive absenteeism, and he sued them for breach of contract and the putative tort of negligent performance evaluation. *Ferrett*, 475 N.W.2d at 244-45. The Michigan Supreme Court held that the allegedly negligent evaluation was not actionable in tort:

> Ferrett complains essentially that GM failed to perform an asserted obligation, arising out of the procedures set forth in the employee handbook, to undertake a third Performance Improvement Plan when he failed to maintain an acceptable attendance record following the completion of the second ninety-day Performance Improvement Plan. In *Hart* [*v. Ludwig*, 79 N.W.2d 895 (Mich. 1956)], this court held that an action in tort may not be maintained for failure to perform a contract.
>
> > We have simply the violation of a promise to perform the agreement. The only duty, other than that voluntarily assumed in the contract . . . , was his duty to perform the promise in a careful and skillful manner without risk of harm to others, the violation of which is not

alleged. What we are left with is defendant's failure to complete his
contracted-for performance. This is not a duty imposed by the
law upon all, the violation of which gives rise to a tort action, but a duty
arising out of the intentions of the parties themselves and owed only
to those specific individuals to whom the promise runs. A tort action
will not lie.

\* \* \*

In the instant case, as in *Hart*, what we are left with is defendant's [alleged failure
to complete his contracted-for performance. Here, as there, the contracted-for
performance is not a duty imposed by the law upon all, but, rather, a duty arising out
of the intentions of the parties themselves only to the those [sic] specific individuals
to whom the promise runs.

\* \* \*

Absent an employer's agreement to provide job security or to discharge only for
cause, the employment relationship is at the will of both parties. Ferrett was
essentially an at-will employee – his employment was month to month – and
therefore he did not have a contractual right to be evaluated or correctly evaluated
before the employer exercised its right to discharge him at will.

Just as the law did not impose on the person who agreed to work the orchard in *Hart
v. Ludwig* a duty to complete the contracted-for performance . . . neither does it
impose on GM a common-law obligation to evaluate or correctly evaluate Ferrett
before exercising its right to discharge him at will. There is, thus, no right arising
at common law as a matter of public policy, separate and distinct from any
contractual right, to be evaluated or correctly evaluated before being discharged from
employment.

*Ferrett*, 475 N.W.2d at 247, 248 (internal citations, quotation marks, and footnotes omitted). The
Michigan Supreme Court noted approvingly that

[c]ases recognizing a right to maintain an action in tort arising out of a breach of
contract by the defendant, generally involve a separate and distinct duty imposed by
law for the benefit of plaintiff that provides a right to maintain an action without
regard to whether there was a contractual relationship between the plaintiff and the
defendant.

In *Clark v. Dalman,* [150 N.W.2d 755 (Mich. 1967)], the duty "imposed by law" was
"the general of a contractor to act so as not to unreasonably endanger the well-being
of employees of either subcontractors or inspectors, or anyone else lawfully on the
site . . . ."

*We conclude that because there is no separate and distinct duty imposed by law to
evaluate or correctly evaluate employees*, Ferrett cannot maintain an action in tort
against GM . . . .

-17-

*Ferrett*, 475 N.W.2d at 248 (emphasis added).

Five years after *Ferrett* **(1991), the Supreme Court seemingly continued to adhere to the *Hart - Ferrett* approach in *Corl v. Huron Castings, Inc.*, 544 N.W.2d 278 (Mich. 1996).** Writing for a four-member majority including Justices Brickley, Mallett, and Weaver, Justice Riley stated:

> Similarly [to *Ferrett* (Mich. 1991)], in the present case, we are confronted with an employer who impliedly contracted to terminate his employee [only] for just cause. The jury held that defendant failed to fulfill his duty. This duty, however, was not imposed upon "all", but only upon [defendant], who impliedly contracted with [plaintiff]. Therefore, we conclude that defendant's liability does not arise in tort.

*Id.* at 281 (footnotes 11 and 12 omitted).

**The year after *Corl*, the Michigan Supreme Court issued *Rinaldo's Const. Corp. v. Mich. Bell Tel. Co.*, 454 Mich. 65, 559 N.W.2d 647 (Mich. 1997).** Rinaldo's experienced serious problems with its telephone service after it moved to a new address, and it sued Michigan Bell on theories of negligence, *res ipsa loquitur*, and willful misrepresentation. *Rinaldo's*, 559 N.W.2d at 651, 454 Mich. 65. Under Michigan law as it already existed, one could sue a telecommunications carrier in a court of general jurisdiction if the cause of action sounded in tort or alleged that the carrier had violated a tariff or regulation. *Id.* If the claim arose solely out of the contractual relationship between the telephone company and the customer, however, the doctrine of primary jurisdiction would oblige the customer to proceed before the Michigan Public Service Commission. *Id.* The trial court and Court of Appeals both reasoned that the phone company's "only duty to Rinaldo's arose 'as a result of a contractual agreement between defendant and a specific individual or entity.'" *Rinaldo's*, 559 N.W.2d at 651 (citation to slip op. omitted). Therefore, the lower courts concluded, Rinaldo's had no cognizable cause of action in tort and was required to assert its claim

before the MPSC.  *Id.*

The Supreme Court affirmed, agreeing that Rinaldo's could not state a tort claim.  Rinaldo's had contended that Michigan Bell owed it "a duty to conduct its business in a reasonable manner; to provide the Plaintiff with adequate telephone service . . . ; to employ competent trained personnel; to maintain, inspect, and use equipment in an appropriate manner so as not to injure the Plaintiff in business; and to be honest and forthright in its dealings with Plaintiff."  *Rinaldo's*, 559 N.W.2d at 656, 454 Mich. 65.  The Supreme Court agreed that Michigan Bell owed Rinaldo's each of the aforementioned duties, but it found that those duties "arose solely out of the contractual obligation between the parties and not from any independent legal obligations supporting a cause of action in tort."  *Id.*  Writing for a unanimous 6-0 Court (with Justice Weaver not participating), Justice Boyle rejected the notion that a claim could sound in tort merely because the complaint alleged tortious conduct.  *Rinaldo's*, 559 N.W.2d at 657, 454 Mich. 65.  The Court approved the Court of Appeals's reasoning that

> [i]n a contractual setting, a tort action must rest on a breach of duty distinct from contract . . . .  Mere failure to perform an obligation under a contract cannot give rise to a negligence cause of action in tort . . . .
>
> The [telephone company] does not owe a general duty to provide and maintain telephone service to the public at large.  To the contrary, defendant's "duty" to do so only arises as a result of a contractual agreement between defendant and a specific individual or entity . . . .

*Rinaldo's*, 559 N.W.2d at 657, 454 Mich. 65.  But the Supreme Court added its own gloss, which might make it more difficult, in some cases, to survive a dispositive motion which challenges the existence of a cognizable tort cause of action.  The question whether a claim sounds in contract or in tort "is not to be resolved by mere allegation, but rather by analysis of whether the facts pled give rise to a legal duty in tort independent of breach of contract."  *Id.* at 657.

-19-

Otherwise, the 1997 Supreme Court again followed *Hart*, approving its statement that "'[a]s a general rule, there must be some negligence or malfeasance to support a tort. There must be some breach of duty distinct from breach of contract.'" *Rinaldo*, 559 N.W.2d at 657, 454 Mich. 65 (quoting *Hart*, 79 N.W.2d 895).

Because it can be so difficult to distinguish between misfeasance and nonfeasance, the *Rinaldo's* Court emphasized *Hart*'s explanation that the fundamental principle separating the causes of action is the concept of duty. The Court observed the common elements running through the cases where misfeasance on a contract was found to support a tort claim: a relationship between the parties or other circumstance that would give rise to a legal duty of care even if there were no contract, and a risk to life or tangible property from the defendant's conduct. The Court wrote:

> [I]n each a situation of peril [was] created, with respect to which a tort action would lie without having recourse to the contract itself. Machinery [was] set in motion and *life or property [was] endangered* . . . . In such cases . . . we have a "breach of duty distinct from . . . contract." Or, as Prosser puts it . . . "if a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not."

*Rinaldo's*, 559 N.W.2d at 658, 454 Mich. 65 (quoting *Hart*, 79 N.W.2d at 895) (emphasis and bracketed alterations in original).[5] ***"In other words, the threshold inquiry is whether the plaintiff***

---

[5]

The Supreme Court has identified one of "the sound policy reasons behind such a rule:

'Tort principles . . . are better suited for resolving claims involving unanticipated physical injury, particularly those arising out of an accident. Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement.'"

*Global Crossing Telecomms., Inc. v. Michigan Bell Tel. Co.*, 2010 WL 2011502, *3 (E.D. Mich. May 17, 2010) (quoting *Williams v. Scottrade, Inc.*, 2006 WL 2077588, *6 (E.D. Mich. July 24, 2006) (Sean Cox, J.) (quoting *Niebarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 486 N.W.2d 612, 615 (Mich. 1992))).

***alleges violation of a legal duty separate and distinct from the contractual obligation.'***[6] *Rinaldo's*, 559 N.W.2d at 658, 454 Mich. 65. Comparing Rinaldo Construction's dispute with Michigan Bell case to the situations it confronted in *Hart* and *Valentine*, the Supreme Court concluded,

> In this case, as in *Hart*, the defendant agreed to provide the plaintiff with services under a contract. Like the defendant in *Hart*, Michigan Bell allegedly failed to fully perform according to the terms of its promise. While plaintiff's allegations arguably make out a claim for "negligent performance" of the contract, there is no allegation that this conduct by the defendant constitutes tortious activity in that it caused physical harm to persons or tangible property; and plaintiff does not allege violation of an independent legal duty distinct from the duties arising out of the contractual relationship.

> Like the plaintiff in *Valentine*, "regardless of the variety of names [plaintiff gives the] claim, [plaintiff is] basically complaining of inadequate service and equipment . . . ." *Id.* at 22, 199 N.W.2d 182. Thus, under the principles outlined above, there is no cognizable cause of action in tort.

*Rinaldo's*, 559 N.W.2d at 658, 454 Mich. 65 (paragraph break added). *See, e.g., Lansing Pavilion, LLC v. Eastwood, LLC*, 2009 WL 2424677, *13 (Mich. App. 6, 2009) (per curiam) (P.J. Sawyer, Murray, Stephens) (affirming dismissal of claim that contractor negligently performed "grading and soil work", because "regardless of the names Lansing Pavilion gives it claim, the duty to perform site balancing 'in a good and workmanlike manner in conformity with industry standards' is not 'separate and distinct' from the duty created in contract.") (relying on *Rinaldo's*, 559 N.W.2d 647, 454 Mich. 65, and its discussion of *Hart*, 347 Mich. 559, 79 N.W.2d 895), *app. denied*, 485 Mich. 1128, 779 N.W.2d 805 (Mich. 2010).

**The Michigan Supreme Court's most recent pronouncement on the tort/contract issue**

---

[6]

It bears emphasis that under Michigan law, "[t]he threshold inquiry is not whether the party alleges 'separate and distinct' *conduct* to support its tort and contract claims, but whether the party alleges 'separate and distinct' *legal duties* to support th[ose] claims." *Consolidated Rail Corp. v. Grand Trunk Western R.R. Co.*, 2009 WL 3460334, *7 (E.D. Mich. Oct. 22, 2009) (Nancy Edmunds, J.) (citing *Rinaldo's*, 559 N.W.2d at 657-58, 454 Mich. 65) (emphasis added).

was *Fultz v. Union Commerce Assocs.*, 683 N.W.2d 587 (Mich. 2004) (Maura Corrigan, C.J., for a 5-member majority).[7]  It is difficult to discern the precise import of *Fultz*, but it criticizes reliance on the misfeasance/nonfeasance distinction.  At the least, *Fultz* purports to relegate analysis of the misfeasance/nonfeasance distinction to a lesser role when determining whether a tort cause of action is cognizable under the particular facts.

Fultz, a pedestrian who was injured when she slipped and fell on ice in a parking lot, sued in negligence against the parking-lot owner, Comm-Co, and the contractor which the owner had contracted to provide snow-removal and salting services for that lot, CML.  *Fultz*, 683 N.W.2d at 589.  At the time of Fultz's fall, CML had not plowed the lot in about 14 hours and had not salted the lot.  *Id.*  The jury found no breach of the oral contract between the owner Comm-Co and contractor CML, but it awarded compensatory damages to Fultz after finding that CML had been negligent by failing to perform under the contract and that said negligence was the proximate cause of her injuries.  *Id.*  The Michigan Court of Appeals affirmed, holding that CML owed a common-law duty to provide the contracted snow-removal and salting services in a reasonable manner, a duty which it breached by failing to perform its contractual obligations.  *Id.*

The 2004 Michigan Supreme Court reversed, holding that, as a matter of law, CML owed no contractual or common-law duty to plaintiff to plow or salt the parking lot.  *Fultz*, 683 N.W.2d at 590.  The *Fultz* majority reasoned as follows:

> If one voluntarily undertakes to perform an act, having no prior obligation to do so,
> a duty may arise to perform the act in a non[-]negligent manner. [citations omitted]

---

[7]One member of the *Fultz* majority, Justice Clifford Taylor, is no longer on the court. But the other four Justices from the *Fultz* majority remain:  Corrigan, Weaver, Young, and Markman.

We described this common-law duty in *Clark v. Dalman*, . . . 150 N.W.23d 755 ([Mich.] 1967):

> Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law . . . .

Such duty of care may be a specific duty owing to the plaintiff by the defendant, or it may be a general one owed by the defendant to the public, of which the plaintiff is a part. Moreover, while this duty of care, as an essential element of actionable negligence, arises by operation of law, it may and does arise out of a contractual relationship, the theory being that accompanying every contract is a common-law duty to perform with ordinary care the thing agreed to be done, and that a negligent performance constitutes a tort as well as a breach of contract. [*Clark*, 150 N.W.23d 755]

In defining the contours of this common-law duty, our courts have drawn a distinction between misfeasance (action) and nonfeasance (inaction) for tort claims based on a defendant's contractual obligations. We have held that a tort action will not lie when based solely on the nonperformance of a contractual duty. *See Hart v. Ludwig* . . . .

\* \* \*

In *Hart* . . . 79 N.W.2d 895, this Court opined that the misfeasance/nonfeasance distinction is often largely semantic and somewhat artificial:

> The division thus made, between misfeasance, which may support an action either in tort or on the contact, and the nonfeasance of a contractual obligation, giving rise only to an action on the contract, is admittedly difficult to make in borderland [sic] cases. There are, it is recognized, cases in which an incident of nonfeasance occurs in the course of an undertaking assumed. Thus a surgeon fails to sterilize his instruments, an engineer fails to shut off steam, a builder fails to fill in a ditch in a public way. These are all, it is true, failures to act, each disastrous detail, in itself, a "mere" nonfeasance.
>
> But the significant similarity relates not to the slippery distinction between action and nonaction but to the fundamental concept of "duty"; in each a situation of peril has been created, with respect to which a tort action would lie without having recourse to the contract itself.

*We believe the "slippery distinction" between misfeasance and nonfeasance of a duty undertaken obscures the proper initial inquiry: Whether a particular defendant owes any duty at all to a particular plaintiff.*

-23-

[We] have defined a tort action stemming from misfeasance of a contractual obligation as the "violation of a legal duty separate and distinct from the contractual obligation." *Rinaldo's* . . . 559 N.W.2d 647 (1997); *see, also, e.g., Ferrett v. Gen. Motors Corp.* . . . 475 N.W.2d 243 (1991) . . . .

**We believe that the "separate and distinct" definition of misfeasance offers better guidance in determining whether a negligence action based on a contract *and brought by a third party to that contract* may lie because it focuses on the threshold question of duty in a negligence claim.** As there can be no breach of a nonexistent duty, the former misfeasance/nonfeasance inquiry in a negligence case is defective because it improperly focuses on whether a duty was breached instead of whether a duty exists at all.

*Fultz*, 683 N.W.2d at 591-92 (emphasis added, internal citations omitted).[8]

*Fultz* **states that this court's initial inquiry should be whether Bell Title owed any duty at all to plaintiff ORT to do the things that Bell Title allegedly failed to do**, *not* focusing on whether ORT has alleged misfeasance or nonfeasance as earlier precedents did. *See Fultz*, 683 N.W.2d at 592 ("We believe the "slippery distinction" between misfeasance and nonfeasance of a duty undertaken obscures the proper initial inquiry: [w]hether a particular defendant owes any duty at all to a particular plaintiff.").

It is undisputed that but for the existence of their contract, ORT and Bell Title had no independent relationship with respect to the closing of these mortgage loan transactions and the attendant recordation of mortgage liens or lien satisfactions. *Cf. Steel Strip Wheels, Inc. v. General Rigging, LLC*, 2009 WL 3190415, *13 (E.D. Mich. 2009) (Rosen, C.J.) (invoking *Niebarger*, 439

---

[8]

At least three non-precedential decisions have suggested that the *Fultz* doctrine does not apply to parties who are in privity in contract, but that view is untenable and has been rejected by later decisions of the Michigan Court of Appeals. *See Hamilton v. Nochimson*, 201 WL 743111, *2 (E.D. Mich. Mar. 1, 2010) (Marianne Battani, J.) (following *Lakeland Reg. Health Sys. v. Walgreens Health Initiative, Inc.*, 604 F. Supp.2d 983, 1000-1002 (W.D. Mich. 2009) (Paul L. Maloney, C.J.) and citing, *inter alia*, *Engel Mgmt., Inc. v. Ford Motor Credit Co.*, 2009 WL 348828, *5 (Mich. App. Feb. 12, 2009)).

Mich. 512, and *Rinaldo's*, to dismiss claim for conversion of deposit, reasoning, "General Rigging's only duty to Plaintiff with respect to the deposit is set by contract; the parties have no independent relationship and the deposit was tendered under the terms of the invoice, not wrongfully taken. * * * Thus, Plaintiff has failed to establish an independent legal duty distinct from the duties arising out of the contractual relationship . . . ."). Accordingly, this court holds that Bell Title would not have, and did not have, the aforementioned duties of care as to ORT "separate and distinct from" the contract. As *Fultz* states, "If no independent duty exists, no tort action based on contract will lie." *Fultz*, 683 N.W.2d at 591; *see also Rinaldo's Const. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647, ___ (Mich. 1997) ("Like the plaintiff in *Valentine*, "regardless of the variety of names [plaintiff gives the] claim, [plaintiff is] basically complaining of inadequate service and equipment . . . . Thus . . . there is no cognizable cause of action in tort.). *See, e.g., Hamilton v. Nochimson*, 201 WL 743111, *3 (E.D. Mich. Mar. 1, 2010) (Battani, J.) ("Hamilton's claims against Nochimson are not separate and distinct from the duties imposed by the parties' agreement. The parties' agreement was for far more than just the performance of particular specified actions by Nochimson; Hamilton gave Nochimson access to his financial accounts so that Nochimson could pay Hamilton's bills and living expenses. Implicit in Nochimson's agreement to use the accounts solely for certain authorized purposes was his agreement not to use the accounts for unauthorized purposes. Accordingly, Nochimson's alleged use of the accounts for such unauthorized purposes was a breach of the parties' contract, and, thus, was not a violation of some other duty that was 'separate and distinct' from the parties' contractual duties. As such, Hamilton may not bring tort claims based on the alleged misuse of his accounts.") (citing *Fultz*, 470 Mich. at 467, 683 N.W.2d 587); *Kroger v. AEC Enters. Const, Inc.*, 2009 WL 4981180, *5 (Mich. App. Dec. 22, 2009) (per curiam) (P.J. Donofrio, Sawyer,

-25-

Owens) (affirming trial court's dismissal of bank customers/borrowers' negligence claim against their bank under *Fultz*).

**Accordingly, on this record, ORT's negligence claim (count 3) is not cognizable at Michigan common law.** *See, e.g., Williams v. Aramark Mgmt. Servs. Ltd. P'Ship*, 2009 WL 529632, *4 (Mich. App. Mar. 3, 2009) (p.c.) (C.J. Saad, Davis, Servitto) (plaintiff alleged that she was injured after slipping on water left on floor by defendant maintenance company's employee; panel applied *Fultz* to affirm summary judgment for defendant because plaintiff failed "to establish that Aramark owed her a duty separate and distinct from its contract with the Inkster Public Schools" and Aramark's "duty to wet-mop the floor was specifically contemplated in the contract").[9]

The court will grant Bell Title's motion to dismiss the negligence claim (count three) on this ground and turn to its motion for summary judgment on the contract claims (counts one and two).

**LEGAL STANDARD: SUMMARY JUDGMENT**

"Summary judgment is proper if the 'pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.'" *Portinga v. Taylor*, 2009 WL 910800, *5, –

---

[9]

The court has discovered two cases where the Michigan Court of Appeals found that the plaintiff could maintain a tort action for the other contracting party's allegedly negligent performance of duties under the contract: *Conant v. State Farm Fire & Cas. Co.*, 2006 WL 1411216, *3 (Mich. App. May 23, 2006) (insurance company's investigation of claim and inspection of premises) and *Waun v. Universal Coin Laundry Machine, LLC*, 2006 WL 2742007, *8 (Mich. App. Sept. 26, 2006) (performance of "cost and income analysis")). Such a determination is highly fact-dependent, however, and *Conant* and *Waun* are of no avail here because they involve very different factual allegations and contexts than our case. Moreover, because *Conant* and *Waun* are unpublished decisions, they have no precedential value in Michigan courts, and this court declines to follow them.

F. Supp.2d –, – (W.D. Mich. Apr. 2, 2009) (Maloney, C.J.) (quoting *Patterson v. Hudson Area Schools*, 551 F.3d 438, 444 (6th Cir.) (quoting FED. R. CIV. P. 56(c)), *cert. denied*, – U.S. –, 130 S.Ct. 299 (2009); *see also Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009). *Accord Alderman v. JC Dev. Communities, LLC*, 2009 WL 2607084, *1 (Mich. App. Aug. 25, 2009) (p.c.) (P.J. Owens, Servitto, Gleicher) ("Summary disposition is proper when, upon examining the pleadings, admissions and other evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.") (citing *Brown v. Brown*, 739 N.W.2d 313, 316 (Mich. 2007)).

The movant has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *ARS*, 602 F. Supp.2d at 845 (citing *Conley*, 266 F. App'x at 404 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial – e.g., if the movant is defending against a claim – "it may meet its burden merely by showing 'that there is an absence of evidence to support the moving party's case.'" *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (quoting *Celotex*, 477 U.S. at 323), *reh'g & reh'g en banc denied* (6th Cir. Oct. 23, 2009). *See also Wilson v. Continental Dev. Co.*, 112 F. Supp.2d 648, 654 (W.D. Mich. 1999) (Bell, J.) (movant "need not support its motion with affidavits or other materials 'negating' the opponent's claim"; rather, its initial burden is only to "point out to the district court that there is an absence of evidence to support the nonmoving party's case . . . .") (citing *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993)), *aff'd o.b.*, No. 99-2113, 234 F.3d 1271, 2000 WL 1679477 (6th Cir. Nov. 2, 2000).

Once the movant has met its burden, the non-movant must present "'significant probative

evidence'" to demonstrate that there is more than "'some metaphysical doubt as to the material facts.'" *ARS*, 602 F. Supp.2d at 845 (citing *Conley*, 266 F. App'x at 404 (quoting *Moore*, 8 F.3d at 339-40)). The non-movant may not rest on the mere allegations of his pleadings. *See Griffin v. Reznick*, 609 F. Supp.2d 695, 698 (W.D. Mich. 2008) (Maloney, C.J.) (citing, *inter alia*, FED. R. CIV. P. 56(e) and *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995)); *see also Transition Healthcare Assocs., Inc. v. Tri-State Health Investors, LLC*, 306 F. App'x 273, 278 (6th Cir. 2009).

If the movant puts forward evidence – such as affidavits, purported business records, purported government records, etc. – the other party cannot withstand summary judgment by simply sitting mute and failing to challenge the authenticity, admissibility, or veracity of those documents. *See Leys v. Lowe's Home Ctrs., Inc.*, – F. Supp.2d –, –, 2009 WL 3255597, *2 (W.D. Mich. 2009) (Maloney, C.J.) (citing *Donoho v. Smith Cty. Bd. of Ed.*, 21 F. App'x 293, 298 (6th Cir. 2001) (Boggs, J.) (affirming summary judgment for employer, Circuit noted that plaintiff's "affidavit does nothing to challenge the evidence put forward by the defendants that the last IEP meeting . . . also included provision to her of the apparently usual verbal and written notices of her rights.")).

Moreover, the mere existence of an alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; there be some genuine issue of *material* fact. *ARS*, 602 F. Supp.2d at 845 (citing, *inter alia*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986))). And the non-movant "cannot defeat a properly supported motion for summary judgment motion by 'simply arguing that it relies solely or in part upon credibility determinations.'" *Heggie v. Kuzma*, 2009 WL 594908, *10 (W.D. Mich. Mar. 6, 2009) (Maloney, C.J.) (quoting *Fogerty v. MGM Group Holdings, Inc.*, 379 F.3d 348, 353 (6th Cir. 2004) (non-movant may not "have a trial on the hope that a jury may disbelieve factually uncontested proof")).

The court must accept the non-movant's factual allegations, *ACLU v. NSA*, 493 F.3d 644, 691 (6th Cir. 2007) (concurrence) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)), *cert. denied*, – U.S. –, 128 S.Ct. 1334 (2008), and view the evidence in the light most favorable to the non-movant, giving it the benefit of all reasonable inferences. *Fox v. Eagle Dist. Co., Inc.*, 510 F.3d 587, 592 (6th Cir. 2007) (Griffin, J.); *see also Patterson*, 551 F.3d at 445.

But the court considers its evidence only to the extent that it would be admissible at trial. *See Elliott Co. v. Liberty Mut. Ins. Co.*, 2009 WL 750780, *10 (6th Cir. Mar. 23, 2009) (Moore, <u>Clay</u>, Kethledge) (on appeal from grant of summary judgment, panel declined to consider extrinsic evidence which would not be admissible under applicable state contract law) (citation omitted); *Bond v. Burson*, No. 96-5459, 134 F.3d 370, 1998 WL 24993, *4 (6th Cir. Jan. 16, 1998) ("The district court also acted within its discretion in denying plaintiff's motion to strike the Smith affidavit from defendants' summary judgment motion. By relying upon the affidavit only for the purposes of establishing the history of the case and DHS's custody of plaintiff, the court properly disregarded those facts not admissible at trial.").[10]

Ultimately, entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party w[ould] bear the burden of proof at trial." *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 447 (6th Cir. 2007) (quoting *Celotex*, 477 U.S. at 322).[11] "As Chief Judge Bell has characterized the

---

[10]*Accord ARS*, 602 F. Supp.2d at 845 (applying Michigan law) (citing *Healing Place*, 744 N.W.2d at 177 (citing MICH. CT. R. 2.116(G)(6) and *Veenstra v. Washtenaw Country Club*, 645 N.W.2d 643, 648 (Mich. 2002))).

[11]

A trilogy of 1986 Supreme Court decisions "made clear that, contrary to some prior precedent, the use of summary judgment is not only permitted but encouraged in certain circumstances . . . ." *Collins v. Assoc'd Pathologists, Ltd.*, 844 F.2d 473, 475-76 (7th Cir. 1988).

post-trilogy summary-judgment standard, '[w]hile preserving the constitutional right of civil litigants to a trial on meritorious claims, the courts are now vigilant to weed out fanciful, malicious, and unsupported claims before trial.'" *Ellis v. Kaye-Kibbey*, 581 F. Supp.2d 861, 874 (W.D. Mich. 2008) (Maloney, C.J.) (quoting *Wilson*, 112 F. Supp.2d at 654); *see also Townsend v. US*, 2000 WL 1616081, *1 (W.D. Mich. Aug. 31, 2000) (McKeague, J.); *Eckford-El v. Toombs*, 760 F. Supp. 1276, 1268 (W.D. Mich. 1991) (Hillman, J.).

### DISCUSSION:  Summary Judgment on the Jackson Closing

In support of its motion for summary judgment on the contract and negligence claims related to the Jackson closing, Bell Title argues as follows:

> The complaint alleges that Bell title failed to cause a prior Standard Federal [B]ank mortgage to be discharged, allowing the mortgagor to amass more debt which prejudiced the subsequent insured mortgagee's foreclosure efforts.

> Heather Capper was employed by Bell Title during the relevant period as a closer who handled the Jackson closing.  Capper stated in her affidavit that her standard practice and procedure at the time would have been to mail the mortgage payoff check to the mortgagee immediately after the closing with a written request to the mortgagee that the funds be applied to pay off a specific amount, that the account be closed, and that any related mortgage or lien be immediately discharged and/or released.  Exhibit C [Capper Aff] ¶ 3 [and ¶ 10].

> By statute (MCL 565.41), once a mortgage has been paid or otherwise satisfied, the mortgagee [Standard Federal] **shall** prepare and file a discharge of mortgage:

> Sec. 41.  (1) Within the applicable time period in section 44(2) after

---

*Accord In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir. 2003) (the trilogy "encourage the use of summary judgment as a means to dispose of factually unsupported claims."); *Bowser v. McDonald's Corp.*, 715 F. Supp. 839, 840 (S.D. Tex. 1989) (the trilogy "encouraged federal district courts to use summary judgment more frequently and economically by changing the movant's burden of production . . . and by allowing qualitative review of evidence") (citations omitted).

a mortgage has been paid or otherwise satisfied, the mortgagee or the personal representative, successor, or assign of the mortgagee *shall prepare a discharge of the mortgage, file the discharge with the register of deeds for the county where the mortgaged property is located, and pay the fee for recording the discharge.* (emphasis added).

Ms. Capper stated that her standard practice was to assume that the mortgagee/lender would follow her instructions and record a discharge unless she heard something back from it, which in this case did not happen. Exhibit C [Capper Aff]. Capper's standard practice and procedure as a Bell Title employee would have been to assume that if the payoff check cleared the bank, that the bank by law is supposed to discharge the related mortgage. *Id.* at ¶ 4.

[T]he plaintiff fails to specify how the Defendant allegedly breached the Agency Agreement [with regard to the Jackson closing]. ORT has pleaded general allegations, without stating a set of facts sufficient for the court to infer that a breach of contract is even *plausible*. This is simply insufficient . . . .

Of course, the uncontroverted affidavit of Heather Capper conclusively establishes the reasonableness of Bell Title's actions at the closing. Any damages suffered by ORT were proximately caused by [mortgagor/borrower] Joe Vermetti and/or [mortgagee/lender] Standard Federal Bank, not Bell Title.

Def Bell's MSJ at 25-26 (complaint cite omitted in first ¶, some boldface & underlining omitted).

Plaintiff ORT begins its response by recounting that "the documentary evidence and affidavits of record reveal that Bell Title failed to conduct the Jackson closing and ensure the requisite discharge of the Vermetti mortgage in accordance with state law and the related closing instructions." P's Opp at 10. ORT explains that by failing to ensure that the Vermetti LOC was closed, the corresponding mortgage loan discharged, and the discharge recorded, Bell Title "prevented the insured lender from securing the first lien position that was intended in the transaction and guaranteed through the commitment/policy of title insurance issued by Bell Title" and caused ORT to pay the Vermetti LOC creditor/mortgagee to clear title to the Jacksons' property. *See* P's Opp at 10.

Much of this dispute at the summary-judgment stage turns on the admissibility, relevance, and arguable probative value of Bell Title's affidavit from real-estate closer Heather Capper, and the inferences which a reasonable factfinder could draw if it credited the statements in Capper's affidavit. Capper stated that her standard practice would have been to mail the mortgage payoff check to the mortgagee immediately after the closing, along with a written request that the mortgagee apply the funds to pay off a specific amount, close the account, and immediately discharge any related mortgage or lien (which Capper knew was intended by the parties to the Jackson closing). *See* Def Bell's MSJ, Ex C (Capper Aff) ¶ 3. But, as ORT correctly notes, Capper also admitted that her standard practice after making that check and request, was to do nothing. Rather than follow up to ensure that the mortgagee or its agent closed the account and publicly recorded discharge of the related mortgage/lien, Capper simply "assumed" that if the mortgagee cashed the payoff check and did not contact Bell Title, then the mortgage must have carried out the requests in Bell's payoff letter, *see* Def's MSJ Ex C ¶¶ 11-13. First Bell concedes that if its employee followed her professed customary practice with the Jackson closing – and Bell does not allege otherwise – she did nothing to follow up on Bell's purported closeout letter to the Vermetti mortgagee/lender. Next, the factfinder will hear that to this day, Bell Title has been unable to produce any mortgagee/lender response to Bell's purported closeout letter (indeed *any* document suggesting that the Vermetti lender did any of the things requested by Bell's alleged closeout letter, i.e. close the LOC account and discharge the related mortgage).

From these undisputed facts and attestations, a reasonable factfinder could find that Bell Title timely sent a closeout letter with appropriate closure/discharge requests to the Vermetti mortgagee/lender, but failed in its contractual obligation to ascertain and acknowledgment whether

the mortgagee did the things requested.

Alternately, the factfinder could reasonably infer that the reason Bell Title cannot produce any acknowledgment of or response to Bell's purported closeout letter is simple: ORT failed to send the closeout letter and customary instructions to Vermetti's mortgagee/lender.[12] [13] That, in turn, could be found to constitute breach of the ORT-Bell Agency Agreement (counts one and two). Significantly, Bell Title has not countered the affidavit of plaintiff ORT's expert, Catherine Lamont, about the prevailing standard of care in the real-estate title industry. Lamont attests that industry standards required a title company (Bell) to have the mortgagor/borrower (Vermetti) sign a discharge/closure letter, send that letter to the mortgagee/lender, and retain a copy for at least seven years. *See* P's Opp, Ex M (Lamont Aff).

On these grounds alone, ORT has shown a genuine issue as to whether Bell Title breached

---

[12]

The factfinder could reach this conclusion even if it believed everything in Bell Title closer Capper's affidavit, because she attested only that it was her standard practice to send a closeout letter and instructions and that the parties intended that she do so in the Jackson case, *not* that she recalls actually doing so after the Jackson closing. Bell Title's bald assertion to the contrary is unsupported by any arguable or colorable interpretation of the words which Capper actually used in her affidavit, and is at best disingenuous. *See* Def Bell's Reply at 3 ("Based on her *recollection that she wrote to the bank, enclosed the payoff check in the proper amount, and expressly requested that the account be immediately closed* . . . .") (emphasis added). Capper said no such thing.

[13]

Defendant Bell Title refers to ORT standard-of-care expert LaMont's "unconfirmed belief" that Bell "breached the standard of care in at least one respect", i.e., "by failing to . . . send a letter to the bank that the Vermetti account should be closed." Def's Reply at 5. But Bell Title is conveniently silent on the undisputed fact that it has never produced a copy or other evidence that it sent the appropriate closeout letter and instructions to Vermetti's mortgagee/lender. A reasonable factfinder could find that LaMont's conclusion that Bell never sent the letter/instructions was "unconfirmed" or unsupported, or it could just as well find that *Bell's* insistence that it sent a letter of which nobody has any concrete record is "unconfirmed" and unsupported. That is precisely the kind of genuine material factual dispute which may not be resolved on summary judgment under federal or Michigan law.

-33-

its contract.

Although it has already done enough to survive summary judgment, ORT further attempts to show a genuine issue as to breach of contract and negligence by arguing that Bell Title failed to comply with MICH. COMP. LAWS § 565.41. That section is entitled "Preparation and Filing of discharge of mortgage; recordation of discharge; notation and effect of date of receipt of discharge by register of deeds." In its entirety, MICH. COMP. LAWS § 565.41 provides as follows

> (1)    Within the applicable time period in section 44(2) [MICH. COMP. LAWS § 565.44(2)] after a mortgage has been paid off *or satisfied*, the mortgagee or the personal representative, successor, or assign of the mortgagee shall prepare a discharge of the mortgage, file the discharge with the register of deeds for the county in where the mortgaged property is located, and pay the fee for recording the discharge.

> (2)    If a discharge of mortgage received by a register of deeds under subsection (1) is not recorded on the day it is received, the register of deeds shall place on or attach to the discharge, by means of a stamp, electronically, or otherwise, the date the discharge is received. The date placed on or attached to the discharge under this section is prima facie evidence of the date the discharge was filed with the register of deeds.

Neither party cites MICH. COMP. LAWS § 565.41(2), and the court perceives no application of that subsection to these claims. Accordingly, the court likewise focuses only on MICH. COMP. LAWS § 565.41(1). WestLaw contains only one helpful decision, by any court, which cites MICH. COMP. LAWS § 565.41(1).

In *Flagstar Bank v. Charter Bank*, 2005 WL 2045907 (Mich. App. Aug. 25, 2005) (per curiam) (P.J. Cooper, Fort Hood, and ret. J. Gribbs), *app. denied*, 474 Mich. 1069, 711 N.W.2d 313 (Mich. 2006), the Michigan Court of Appeals panel noted as follows,

> However, the Legislature has enacted several statutes solely governing future advance mortgages. [fn.17 citing MICH. COMP. LAWS §§ 565.901 - 565.906] Statutes that relate to the same subject or share a common purpose are *in pari materia* and must be read together as one law. [n. 18 citing *State Treasurer v.*

*Schuster*, 456 Mich. 408, 417, 572 N.W.2d 628 (Mich. 1998)]

MCL 565.901(1) defines the terms "future advance" and "future advance mortgage" as follows:

>    (a)    "Future advance means an indebtedness or other obligation that is secured by a mortgage and arises or is incurred after the mortgage has been recorded, whether or not the future advance was obligatory or optional on the part of the mortgagee.

>    (b)    "Future advance mortgage" means a mortgage that secures a future advance and is recorded either prior to or after the effective date of this act . . . .

MCL 565.902 provides:

>    Except as otherwise provided by this act, a future advance mortgage securing a future advance shall have priority with respect to the future advance as if the future advance was made at the time the future advance mortgage was recorded.

Flagstar contends that MCL 565.41 requires a mortgagee to discharge a mortgage upon full payment, regardless of whether the mortgagor would otherwise be allowed to continue drawing on the credit line. This interpretation conflicts with those statutes governing future advance mortgages, because it would require discharge of a future advance mortgage whenever the amount of the secured debt is reduced to zero, although the future advance mortgage would otherwise secure future advances with priority over later-recorded mortgages. No statute requires that some balance be owing on a line of credit in order to be secured by a future advance mortgage, and we may not infer that the Legislature intended such a requirement. [n.21 citing *People v. Lange*, 251 Mich. App. 247, 253-54, 650 N.W.2d 69 (Mich. App. 2002)]

By using the phrase [in MICH. COMP. LAWS § 565.41(1), which governs mortgages generally] "paid *or* otherwise satisfied", the Legislature recognized that satisfaction of a mortgage may involve some action other than payment. **A future advance mortgage is not "paid or otherwise satisfied"** pursuant to MCL 565.41unless the debt is paid off *and* future advances are terminated, either because the secured credit line has expired or [because] the borrower has closed the account.

*Flagstar*, 2005 WL 2045907 at *3-4 (nn. 19-20 and 22 omitted) (italics original, boldface added).

The Michigan Court of Appeals subsequently held, in a published decision, that a future advance

mortgage is not "paid or otherwise satisfied" within the meaning of Mich. Comp. Laws § 565.41(1) where the mortgagee/lender did not receive mortgagor/debtor's written authorization to close the LOC and did not send mortgage-discharge documents, notwithstanding that the mortgagee received full payment. *See Deutsche Bank Trust Co. Americas v. Spot Realty, Inc.*, 269 Mich. App. 607, 714 N.W.2d 409 (Mich. App. 2005) (per curiam) (P.J. Cooper, Fort Hood, Borrello).

Plaintiff ORT properly relies on the difference between Michigan's statutory treatment of mortgage satisfaction generally and its statutory treatment of *future advance mortgage* satisfaction in particular to show another genuine issue of fact as to whether Bell Title was negligent and/or breached its contractual obligation. ORT presents the affidavit of Catherine LaMont, whom it offers as an expert on the title industry standard of care. LaMont attests that

> future advance mortgages are treated differently than standard mortgages because the open line of credit can be paid down at any time to a balance of zero, but still remain open and available to the borrower. For this reason, it is required industry practice to send not only a payoff to the lender, but also a discharge letter signed by the borrower directing the bank to close the line of credit. Ex. M [LaMont Aff]. Bell Title's failure to do this was a breach of its duty and standard of care. *Id.*

> It was, likewise, clear from the face of the Vermetti mortgage that paying off the balance would not fully satisfy Vermetti's obligations or terminate the credit line. Vermetti would still have access to the credit line throughout its term, and the mortgage would continue to secure such debt until such time as the account was paid off and closed, and the mortgage discharged. Therefore, pursuant to the terms of the [Vermetti future advance] mortgage of record, two steps (i.e. pay off and termination) had to be taken by Bell Title at the time of the Jackson closing to invoke Standard Federal [n/k/a LaSalle]'s statutory duty to discharge the mortgage.

> The proofs lead to the conclusion that Bell Title took only one of those steps, and left termination of the credit line and corresponding discharge of the Standard Federal mortgage to chance. Such actions fall far short of that which was required of Bell Title pursuant to applicable industry standards, as well as pursuant to the Agency Agreement and the lender's closing instructions. * * *

P's Opp at 13. The court determines that a factfinder could reasonably find that Bell Title failed to

do what it knew or readily should have known – by the terms of the Vermetti future advance mortgage, and by the provisions of Michigan statute governing such mortgages – was required to effect and ensure the closure of Vermetti's LOC and the publicly-recorded discharge of his future advance mortgage.

### DISCUSSION:  Summary Judgment on the Edwards Closing

To review, the parties agree that Edwards and Towers borrowed about $134,000 from Argent on Thursday, November 11, 2004, secured by a mortgage on their real property; the loan was funded after the rescission period expired on Tuesday, November 16, 2004; and Bell Title sent the mortgage to be recorded and it bears a stamp showing receipt by the Ingham County Register of Deeds on Monday, November 22, 2004.  *See* Def Bell's MSJ, Ex B (copy of recorded Edwards mortgage). However, the Edwards mortgage also bears a second "received" stamp dated  Wednesday, November 24, 2004 which was crossed out by hand by an unidentified person, and a *third* "received" stamp dated January 31, 2005, and the mortgage was not recorded until February 3, 2005 – more than two and a half months after the Edwards mortgage was funded.  *See id.*[14]  Bell Title states that after investigating, it has "like the Register of Deeds, has no definitive explanation for the multiple 'received' stamps on the recorded mortgage or [for] the delay in recordation."  Def's MSJ at 11 (citing Ex B - Affidavit of Bell Title President Leigh Kraushaar dated May 12, 2009).

---

[14]

Defendant Bell's counsel states that during discovery, he "spoke with several individuals at the Ingham County Register of Deeds who agreed that the stamps on the mortgage indicate it was first received on 11/22/2004", but he fails to specify the date of the alleged conversations or name the county employees with whom he spoke.  Moreover, the court reminds counsel that statements by counsel are not evidence.  Defendant must provide an affidavit, deposition transcript, or the like to render such statements admissible.  *See Griffin v. Reznick*, ____ (W.D. Mich. 2008) (Maloney, C.J.).

Bell Title states that

> [b]ecause there is no file to examine, Bell Title can only surmise that what probably happened then involved a 1st Class mailing of the mortgage to the Ingham County Register of Deeds (which is perfectly acceptable) on a Wednesday (11/16/2004). The U.S. Postal Service then delivered the mail in due course to the Register of Deeds where the date stamps made by the clerks on the Edwards mortgage prove that it was first received by that office on Monday, 11/22/2004 (and perhaps even the prior Friday where it sat before being stamped on Monday.) In any case, the stamped business date is four (4) business days after the funding of the loan closed by Bell Title. Undeniably, there is no proof challenging the possibility [sic!] that Bell Title "submitted for recording" the mortgage within 24 hours of funding . . . .

> And since ORT waited so long to bring this claim, and discovery is closed, it is now impossible for Bell Title or anyone else to know what actually happened at the Register of Deeds office which delayed the recordation of the mortgage until February 3, 2005.

Def Bell's Reply at 8. By contrast, plaintiff ORT points to evidence suggesting that the delay in recording may have been occasioned by Bell Title failing to submit the appropriate fee to the County Register. *See* P's Opp at 15-16 ("It appears from the Single Ledger Balance Report attached to the Kraushaar Affidavit that the check which was issued to the Ingham County Register of Deeds for recording was in the amount of $1,209.40. However, the fee to record the Edwards mortgage would have been approximately $80 according to the fee schedule (Exhibit L . . .), and was listed on the Borrowers Disbursement Statement as $70 (Exhibit N . . .). Thus, contrary to Bell Title's assertion that no evidence exists as to why the Edwards mortgage was delayed in recording, material questions of fact remain as to whether the Edwards mortgage was delivered to the Register of Deeds with all appropriate fees.").

Relying on the stamp showing that the Ingham County Register of Deeds received the Edwards mortgage on November 22, 2004, Bell Title maintains that it delivered the Edwards mortgage payoff to the Ingham County Register for recordation on that date, just four business days

after the three-day rescission period expired and the mortgage loan was funded. *See* Def's MSJ at 12. Bell emphasizes that a review reveals no records indicating that the County Register returned the Edwards mortgage to Bell, nor any records explaining the County Register's long delay in recording the mortgage. *See* Def's MSJ at 13. Bell Title writes as follows:

> There is no evidence rebutting Bell Title's analysis of events surrounding the Edwards closing. The Register of Deeds does not contradict Bell Title. No one from the lender contradicts Bell Title. The borrower does not contradict Bell Title. Absent proof of negligence or breach of contract, recovery upon merely speculative theories is impermissible. ORT cannot now offer a differing "theory" of the claim against Bell Title. * * *
>
> * * *
>
> * * * The sole argument that the recording happened late is not, by itself, proof of Bell Title's breach of contract. This is not a strict liability claim and Plaintiff should aver and establish more facts to plead a cause of action for breach of contract. It is Plaintiff's burden to specify the closing instruction that was breached and how Bell Title was the cause, not just state generally that there is a breach of contract.

Def Bell's MSJ at 13-14 and 24. The court finds Bell Title's arguments on this score untenable.

For at least two reasons, plaintiff ORT has shown that there are genuine issues of material fact as to whether Bell was negligent and/or breached the contract with regard to the Edwards closing. First, Bell Title fails to explain what would prevent a factfinder from reasonably finding that the Ingham County Register of Deeds did not receive the Edwards mortgage until January 31, 2005 (the date of the third stamp), more than two months after the funding of the mortgage loan. Such a finding would support the inference that Bell Title did <u>not</u> take reasonably timely action to send the Edwards mortgage to the Register.

Second, even if the jury found that Bell Title delivered the Edwards mortgage to the Register on November 22 or November 24, 2004 (the dates of the first two "received" stamps), the fact remains that the Register did not record it until February 3, 2005. Significantly, Bell Title does not allege that it took *any* action to follow up, after the Register received the mortgage, to ensure that

-39-

the mortgage was recorded on the day of its receipt or within a very short period thereafter. That, too, a reasonable factfinder could determine to be a breach of Bell Title's contractual obligations, i.e., breach of the agency agreement. ORT quotes Argent Bank's closing instructions to Bell Title in conjunction with the Edwards transaction. Argent cautioned that "[n]o disbursement of loan proceeds are [sic] permitted until Lender is assured of its position as First Lien holder" and instructed Bell Title to "[s]ubmit all recordable instruments within 24 hours of Lender[']s wiring of closing funds or expiration of rescission period, if applicable." P's Opp at 14 (citing Ex I at 1 ¶ 4 and 2). Even assuming that the earliest of the three "received" stamps (November 22, 2004) is accurate and the later stamps are not, that would mean that Bell Title did <u>not</u> comply with Argent's written instruction to record the mortgage within 24 hours of Argent funding the mortgage, i.e., within 24 hours of sometime on Tuesday, November 16, 2004.[15]

While Bell Title asserts that those contractual obligations were "not reasonable," the fact remains that the signed contract provides for the same. This Court cannot re-write the contract. *See*

---

15

On March 31, 2010, plaintiff ORT filed a six-page "sur-reply" brief, Doc 45, but never filed a motion seeking leave to file same. "It is well established that parties do not have a right to file a sur-reply brief, whether under the Federal Rules of Civil Procedure or the local rules of our district, and both this court and other federal courts rarely grant leave to file a sur-reply." *Aslani v. Sparrow Health Sys., Inc.*, 2009 WL 3711602, *22 (W.D. Mich. Nov. 23, 2009) (Maloney, C.J.) (footnote and citations omitted). "The court rules do not authorize [a party] to file supplemental briefs at his pleasure. The local court rules provides that '[t]he Court may permit or require further briefing.'" *Harshaw v. Bethany Christian Servs., Inc.*, 2010 WL 610262, *1 (W.D. Mich. Feb. 19, 2010) (quoting W.D. Mich. LCivR 7.2) (other internal citations omitted).

Because ORT never sought leave to file the sur-reply, it is not properly before the court and has not been considered. *See Ross, Brovins, & Oehmke, P.C. v. LEXIS/NEXIS Group*, 463 F.3d 478, 488-89 (6th Cir. 2006) ("The district court does not have to accept every filing submitted by a party.") (citing *Jones v. Northcoast Behavioral Healthcare Sys.*, 84 F. App'x 597, 599 (6th Cir. 2003) and holding that district court did not abuse its discretion in striking a supplemental summary-judgment brief).

*Acorn Investment Co. v. Michigan Basic Property Ins. Ass'n*, 2009 WL 2952677, *6 (Mich. App. Sept. 15, 2009) (per curiam) (P.J. Sawyer, Cavanagh, Hoekstra) ("A court cannot rewrite a contract if its terms are expressly stated.") (citing *McDonald v. Farm Bureau Ins. Co.*, 480 Mich. 191, 197, 747 N.W.2d 811 (Mich. 2008)); *see, e.g., Quandt v. Quandt*, 2010 WL 1565562, *4 (Mich. App. Apr. 20, 2010) (per curiam) (P.J. Kelly, Talbot, Wilder) ("This Court cannot rewrite the parties' contract with the mortgage company or subsequently alter their obligations to this third party."); *Arevalo v. Arevalo*, 2010 WL 1330636, *13 (Mich. App. Apr. 6, 2010) (per curiam) (P.J. Hoekstra, Beckering, Shapiro) ("A court cannot rewrite an unambiguous contract on the basis of the parties' reasonable expectations.") (citing *Burkhardt v. Bailey*, 260 Mich. App. 636, 656-57, 680 N.W.2d 453 (Mich. App. 2004)).

## <u>ORDER</u>

Defendant's corrected motion to dismiss the amended complaint or for summary judgment **[#35] is GRANTED in part, DENIED in part, and DENIED without prejudice as moot in part**.

Count three (negligence) is **DISMISSED** for failure to state a claim.

Defendant's motion for summary judgment is **DENIED** as to counts one and two (contract claims) and **DENIED without prejudice as moot** as to count three (negligence).

Counts one and two survive for trial.

This is not a final and immediately appealable order, because it does not conclusively dispose of all issues as to all parties. *See Griffin v. Reznick*, 609 F. Supp.2d 695, 709 (W.D. Mich. 2008) (Maloney, C.J.) ("Absent certification of an interlocutory appeal under 28 U.S.C. § 1292(b) or FED. R. CIV. P. 54(b), an order disposing of fewer than all parties or claims is nonappealable.") (citing, *inter alia, Wm. B. Tanner Co. v. US*, 575 F.2d 101, 102 (6th Cir. 1978)).[16]

**IT IS SO ORDERED** on this 30th day of June 2010.

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge

---

[16]

*See, e.g., Conti v. Am. Axle & Mfg. Inc.*, 326 F. App'x 900, 918 (6th Cir. 2009) ("Because that order did not resolve all issues relating to that dispute, it is not a 'final' order subject to appeal under [28 U.S.C.] § 1291.") (Batchelder, <u>White</u>, D.J. Greer);

*Rochester Midland Corp. v. Enerco Corp.*, 2009 WL 1561817, *20 (W.D. Mich. June 1, 2009) (Maloney, C.J.) (order denying motion for summary judgment is not a final order, whether based on legal or factual grounds) (citing *Settembre v. Fid. & Guar. Life Ins. Co.*, 552 F.3d 438, 441-42 (6th Cir. 2009) (Kethledge, J.) (dismissing, for lack of jurisdiction, an appeal from district court's reversal of bankruptcy court's grant of summary judgment)).